IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MATTHEW G. JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 09-3100 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

RICHARD MILLS, U.S. District Judge:

This case is before the Court on the Plaintiff's motion for summary judgment and the Defendant's motion for summary affirmance.

Defendant's motion is allowed.

I. INTRODUCTION

On March 27, 2008, Plaintiff Matthew G. Jones applied for disability insurance benefits and supplemental security income under the Social Security Act. The Plaintiff alleged that he became disabled on February 19, 2008. The Plaintiff's applications were denied initially on June 30, 2008,

and again upon reconsideration on August 8, 2008.

On August 20, 2008, the Plaintiff requested a hearing before an administrative law judge ("ALJ").  A hearing was held on November 3, 2008, where the Plaintiff and a vocational expert testified.  After considering the evidence, the ALJ found that although the Plaintiff had "severe impairments," these impairments did not meet or equal any listed impairment.  The ALJ found that Plaintiff could perform sedentary work as defined in the regulations, except that "he cannot climb ladders, ropes, or scaffolds; he can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and he needs a sit/stand option."

In relying on the testimony of the vocational expert, the ALJ concluded that Plaintiff was not disabled because he could perform a significant number of jobs.  The Plaintiff requested review of the ALJ"s decision.  On February 27, 2009, the Appeals Council found no basis to review it.  The Plaintiff timely sought judicial review pursuant to 42 U.S.C. § 405(g).

## II.  FACTUAL BACKGROUND

A. Pre-Onset Medical Evidence

The Plaintiff was born in 1981 and resides in Virden, Illinois.  Prior to his alleged onset date, the Plaintiff sought treatment for head and back injuries sustained in an accident in October 2005.  As of April 2007, he had no difficulty ambulating and his neurological examination was normal.  Doctors diagnosed left lumbosacral radiculopathy based on the results of a June 2007 nerve study.

The Plaintiff reported ongoing neck and back pain on October 17, 2007, though his neurological examination remained normal.  Although he told the doctor that the Army had restricted him to desk work and a shorter week, the Plaintiff told David J. Bitzer, M.D., over the course of three appointments less than one month later, that his typical duties in the Army required ten hours of mental and physical work daily and seven hours of heavy exercise per week.

On December 14, 2007, doctors found a "moderate sized arachnoid

cyst" on the Plaintiff's brain.[1]  Doctors also found mild narrowing in the Plaintiff's lower lumbar spine with the lowest grade of spondylolisthesis, a slight displacement of a vertebra.  A cervical spine MRI was "[n]early normal," with only minimal disc protrusion.  Doctors prescribed physical therapy for the Plaintiff's neck pain.  During the course of treatment, the Plaintiff on one occasion stated that he had not done many of the recommended home exercises.  On at least two occasions, his compliance with his exercises was termed "questionable."

By early December, the Plaintiff reported alternately that he "hardly ever gets headaches anymore" and that his neck and shoulders were "feeling much better;" that he still had headaches 1-2 times per week and "some neck pain;" and that he was 90% improved, but had lower back pain.  The therapist noted that Plaintiff's neurological examination, neck range of motion, upper extremity strength, and upper extremity range of motion were all normal.  The Plaintiff was discharged from physical therapy on December 7, though it was recommended that he continue the "postural re-

---

[1]The Defendant alleges that the cyst was found on November 15, 2007.  The cited portion of the record, however, indicates that it was found on December 14.

4

education exercises at home."

On November 16, 2007, Lacie Shanks, M.D., treated the Plaintiff for complaints of depression, neck pain, back pain, and memory loss.  Dr. Shanks opined that the memory loss symptoms were "most likely" due to stress and depression.  The Plaintiff had a normal gait, stance and neurological examination.  The Plaintiff denied any numbness or tingling, disorientation, dizziness, balance problems, nausea or blurred vision.

In a follow-up visit with Dr. Shanks, on December 4, 2007, the Plaintiff reported that his neck and back pain had "overall improved." However, he complained of "longstanding" numbness and tingling in his arms and hands, dizziness, memory loss, and nausea.

On January 16, 2008, the Plaintiff saw Dr. Shanks for complaints of fever, nausea and other symptoms.  The doctor thought the Plaintiff may have been getting over the flu, based on his complaints, and noted "a question of whether or not he has "tru[]ly been sick."

At a January 30, 2008, appointment, the Plaintiff told Dr. Shanks that he had no new concerns and no side effects from his medications.  Dr.

Shanks found that Plaintiff had full range of motion and 5/5 strength in all joints, and exhibited a normal mood and affect.

### B. Post-Onset Medical Evidence

On March 11, 2008, approximately three weeks after the Plaintiff alleges he became disabled, he sought treatment at a VA clinic for back pain, headaches, the arachnoid cyst, and other complaints.  The Plaintiff did not report neck pain and his medical conditions were all "stable."  The Plaintiff was being discharged from the Army due to a legal problem.  The nurse practitioner found that Plaintiff had some weakness and decreased reflexes in his left leg, but a full range of motion in all extremities and could "sit, stand and ambulate without difficulty."  Although the Plaintiff's depression screening was positive, the nurse practitioner determined that he had "[n]o mental health condition requiring further intervention."  The Plaintiff told a social worker that he experienced disorientation, dizziness, memory loss, balance problems, and blurred vision.

On May 30, 2008, a state agency reviewer examined the Plaintiff's records and opined that his physical impairments were not severe.  On June

6

2, 2008, a second state agency reviewer examined the Plaintiff's records and opined that his mental impairments were not severe.  Any depression was controlled by medication and did not restrict the Plaintiff's functioning. Another state reviewer later affirmed both findings.

On March 18, 2008, the Plaintiff requested an eye exam because the long distance vision in his right eye was blurry.  On May 23, the Plaintiff told a VA optometrist that he had never worn glasses before, but now had blurred vision, especially in his right eye.  The optometrist found that Plaintiff had 20/20 vision in his right eye and 20/40 vision in his left eye.

On June 17, 2008, a VA social worker treated the Plaintiff for his "legal and marriage issues."  She opined that Plaintiff has an adjustment disorder, marital problems, and paraphilia,[2] and a GAF score of 50.[3]

In September 2008, the Plaintiff returned to SIU-Springfield with

---

[2]A paraphilia generally involves "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or nonconsenting persons" and occurs over a period of at least six months.  Am. Psychiatric Ass'n, Diagnosis and Statistic Manual of Mental Disorders 566 (4th ed., text rev. 2000) ("DSM-IV-TR").

[3]A Global Assessment of Functioning ("GAF") score between 41 (low-end) and 50 (high-end) is defined as "[s]erious symptoms . . . or any serious impairment in social, occupational or school functioning . . . ." DSM-IV-TR at 34.

complaints of "pressure" in his head, balance problems, and sensitivity to light.  The nurse practitioner found that Plaintiff could "sit, stand, and ambulate without difficulty" and had a full range of motion in all of his extremities.  The Plaintiff's neurological examination was normal.  The nurse practitioner recommended no treatment plan, testing or further follow-ups.

The record also contains an October 30, 2008, letter signed by Melissa Brown at Christian County Mental Health Association.  Brown's letter does not state a medical specialty, job title, or any other credentials.[4]  Brown's letter states that she began counseling the Plaintiff in July 2008 and refers to "symptoms" of depression and anxiety that caused Plaintiff to "struggle" with sleep and daily activities and with "returning to a fully functioning status."  Brown's letter is not accompanied by any treatment notes, and contains no formal diagnoses or opinions about any work-related limitations that the Plaintiff may have experienced.

C. Dept. of Veterans Affairs Compensation and Pension Evaluation

---

[4]The ALJ noted that Plaintiff testified that Melissa Brown is one of the counselors at the VA clinic in Springfield.

8

On June 18, 2008, the Plaintiff underwent several detailed examinations for purposes of determining VA benefits.  Carmen Quenzer, Psy. D., evaluated the Plaintiff's complaints of depression and anxiety.  The Plaintiff reported that in recent weeks, he had bouts of insomnia and would "sleep very little for two or three days at a time, and then sleep for a stretch of 10-12 hours."  Although the Plaintiff told Dr. Quenzer that he had received mental health treatment in the Army, and with a therapist after his discharge, the doctor found no record of such treatments.

Dr. Quenzer found that the evidence of depression was the single note by Dr. Shanks and the evaluation by the VA social worker.  Dr. Quenzer concluded that Plaintiff did not meet the diagnostic criteria for major depressive disorder.  The doctor opined that any worry or anxiety was related to his legal issues and his sadness of mood was related to his marital problems.  Dr. Quenzer diagnosed the Plaintiff with an anxiety/adjustment disorder.

The same day, Tanneemul Haque, M.D., performed a general physical examination for the Plaintiff's VA benefits.  Dr. Haque's treatment notes

make no mention of headaches.  The Plaintiff reported no fevers, malaise, dizziness, visual disturbances, numbness, or weakness with his neck or back pain.  The Plaintiff reported taking medication "as needed" and did not mention any side effects.  He told Dr. Haque that his back pain affected his daily activities, but his neck only occasionally affected them.  The Plaintiff reported being able to stand for 45 minutes at a time.  His back pain only occasionally affected his job.  However, neither his neck pain nor his back pain had caused any periods of incapacitation in the past year.

Dr. Haque's physical examination revealed that Plaintiff had a normal gait and posture.  The Plaintiff had full extension and flexion in his neck, and 80/90 flexion, and 30/30 lateral flexion, extension and rotation in his back.  Although the Plaintiff claimed that he could not bend his neck laterally, Dr. Haque observed that his neck rotation was nonetheless unaffected.

Dr. Haque opined that Plaintiff had minimal cervical disc protrusion, slight spondylolythesis and suggestion of spondylolysis, and mild radiculopathy in his lower extremity by history.  In his opinion, however,

there was "no objective evidence of painful motion, spasm, weakness or tenderness" in the Plaintiff's neck or back, and that Plaintiff's neurological, upper, and lower extremity examinations were normal.

Three hours after Dr. Haque's exam, Steven R. Brenner, M.D., a VA neurologist, examined the Plaintiff for headaches, neck and back pain complaints.  The Plaintiff told Dr. Brenner that medications for his headaches eliminated the pain within a few hours, but made him drowsy. He was tired during the day, but did not sleep, and had not slept in the previous 24 hours.  He reported that his left eye was always blurry and that his right eye was blurry only when he had headaches.  The Plaintiff reported no mental problems, though he claimed some short term memory issues. Sitting helped his back pain.

The Plaintiff told Dr. Brenner that he experienced daily headaches, "extreme" back pain radiating into his lower leg, and periodic neck stiffness that caused him to be completely unable to move his neck.  Dr. Brenner found that he had some range of motion restriction in turning his neck to the left but not to the right.  The Plaintiff reported having only half the

11

strength in his left leg when compared with the right, though Dr. Brenner only observed "mild weakness" in the left leg.   The Plaintiff exhibited decreased sensation in his left foot and lower leg and walked with a slight limp.   Dr. Brenner recommended that Plaintiff undergo three MRIs: one to evaluate his back for any nerve compression in his lumbar spine that could cause back pain or left leg numbness; a second of Plaintiff's cervical spine to identify any abnormality likely to cause neck pain; and a third of Plaintiff's head to locate any structural abnormality of the brain that could cause Plaintiff's headaches.

The MRI of the Plaintiff's back revealed "slight" spondylolythesis with a suggestion of low grade spondylolysis, but no disc herniation,  stenosis, or other abnormalities.   MRIs of the Plaintiff's neck showed a loss of curvature, but no spinal cord involvement and an otherwise normal cervical spine.  The MRI of the Plaintiff's head revealed no structural abnormalities in the brain, and aside from the presence of the cyst was "otherwise unremarkable."

On August 29, 2008, the Department of Veterans Affairs issued a decision under its regulations assigning a 60% service-connected disability

due to the arachnoid cyst.  The decision stated that the 60% rating was automatically assigned to all benign growths in the brain.  It was not a permanent rating.  The decision also noted that Plaintiff's cyst did not cause any other abnormalities or problems.  The decision set the Plaintiff's disability due to his back and neck at 10%, attributable solely to the report of limited range of motion and irrespective of any pain complaints.  The decision further stated that "purely subjective complaints such as headache, dizziness, insomnia, etc. . . . will be rated at 10% due to a lack of objective evidence to support a higher evaluation.  The Plaintiff's claim for service-connected disability due to depression and anxiety was denied.

D. Hearing Testimony and ALJ's findings

At the time of the hearing, the Plaintiff lived alone in a house with a basement, though his mother stayed with him occasionally.  He took care of his personal hygiene, prepared some of his meals, went grocery shopping, read military history books, and did about half of his laundry.  The Plaintiff visited his mother once a week, and people visited him once or twice a week. He testified that before his injuries, he worked 15-18 hours a day and ran

13

5-8 miles a day.  He claimed that he was discharged from the military due to his physical injuries.  On a daily basis, the Plaintiff could do some light repair work around the house, and spent "most of [his] time outside" caring for four dogs.  He also testified that he spent "most of [his] time" sleeping because of migraines or medication, and that he spent a "couple hours a day" watching TV.

The Plaintiff testified both that side effects from medications caused him to sleep more than twelve hours per day and that, even on medications, he napped for an hour to an hour and a half during the day and often had trouble sleeping at night–falling asleep between 2:00 to 5:00 a.m. and waking up every half hour to an hour.  He complained that he passed out on occasion and that his back, left hip, and left knee would "lock up" if he sat up or stood too long because of "severe nerve damage" in his back and left leg.  He complained of constant numbness and tingling in his left leg and a limited range of motion in his neck.

The Plaintiff testified that he could only lift five or ten pounds, could not bend over, and that if he had to hold weight for "any length of time,"

14

that he could not open his hands up and it caused shooting pains in his neck and spine.  He testified that he had to change positions every 20 to 30 minutes when sitting and that he could only stand for ten minutes before sitting back down.  The Plaintiff testified that after an hour, he had to lie down because of back pain and his rotated sacrum.  He stated that doctors had limited him to lifting less than ten pounds and had recommended lumbar fusion surgery.  The Plaintiff informed the ALJ that his pain averaged 7 out of 10, and that he had incapacitating, constant, 10/10 pain for approximately 1-2 weeks prior to the hearing.  He had daily dizziness, blurred vision, and light and noise sensitivity due to migraines, though medication alleviated the migraines within an hour.

The ALJ presented the vocational expert with a hypothetical claimant who could perform sedentary work, but required a sit/stand option, and was limited to occasional postural limitations with no ropes, ladders or scaffolds. The vocational expert testified that this hypothetical claimant could perform a number of sedentary jobs, providing representative examples of telephone operator and telephone solicitor.  The vocational expert opined that even if

15

the hypothetical claimant was limited to simple routine tasks, he could still work as a surveillance system monitor and circuit board screener.

The ALJ determined that Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that "he cannot climb ladders, ropes, or scaffolds; he can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and he needs a sit/stand option." The ALJ began by summarizing the objective medical evidence and the Plaintiff's statements regarding his symptoms. The ALJ concluded that although the Plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms," the Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Based on the objective medical evidence and other evidence, including his own observations, the ALJ further found the Plaintiff's credibility to be "suspect."

## III. ANALYSIS

### A. Standard of review

When, as here, the Appeals Council denies review, the ALJ's decision stands as the final decision of the Commissioner.  See Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010).  The Act specifies that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  See Terry v. Astrue, 580 F.3d 471, 475 (9th Cir. 2009) (citations and internal quotation marks omitted).  Although the ALJ need not address every piece of evidence or testimony presented, he must provide a "logical bridge" between the evidence and his conclusions. See id.

### B. ALJ's finding as to Plaintiff's credibility

The Plaintiff contends that the ALJ's decision is contrary to law.  The Plaintiff first alleges that although the ALJ discussed at length his musculoskeletal difficulties, the ALJ did not cite a single medical exhibit in

his decision denying disability which supported his evaluation that Plaintiff

could perform "sedentary" work.  Moreover, because symptoms such as pain

sometimes suggest a greater severity of impairment than can be shown by

objective medical evidence alone, the Plaintiff asserts that a claimant may

be found disabled on nothing more than the claimant's allegations–if the

claimant's symptoms and the related allegations are found to be credible.

All symptoms, including a claimant's pain, and "the extent to which

[the] symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence," are considered in determining

whether a claimant is disabled.   See 20 C.F.R. § 404.1529(a).   That

regulation goes on to provide, in part:

> [S]tatements about your pain or other symptoms will not alone
> establish that you are disabled; there must be medical signs and
> laboratory findings which show that you have a medical
> impairment(s) which could reasonably be expected to produce
> the pain or other symptoms alleged and which, when considered
> with all of the other evidence (including statements about the
> intensity and persistence of your pain or other symptoms which
> may reasonably be accepted as consistent with the medical signs
> and laboratory findings), would lead to a conclusion that you are
> disabled.

Id.  Additionally, any of the claimant's statements about his symptoms,

18

"such as pain, and any description [he], [his] treating source or nontreating source, or other persons may provide about how the symptoms affect [the claimant's] activities of daily living and [his] ability to work" are considered. <u>See</u> 20 C.F.R. § 416.929(a).

Citing <u>Knight v. Chater</u>, 55 F.3d 309 (7th Cir. 2005), the Plaintiff notes that the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." <u>Id.</u> at 314. However, "subjective complaints of pain that are inconsistent with the evidence as a whole" may be discounted. <u>Id.</u> Many of the Plaintiff's complaints are inconsistent with the evidence as a whole or even with his own statements.

In considering the evidence as a whole, the ALJ determined that Plaintiff's testimony with respect to his pain did not appear to be credible. The Defendant notes that Plaintiff's brief does not specifically address the ALJ's finding that his "credibility is suspect" and further notes that, "[d]ue to the claimant's exaggerations," the ALJ gave "minimal weight" to his testimony about his limitations.

The Defendant points to several examples of the Plaintiff's exaggerations or contradictions that the ALJ cited in discussing the evidence. Although the Plaintiff testified that he could only sit for 20 to 30 minutes before standing up, and that he would have to lie down after "less than an hour," the ALJ observed that Plaintiff only stood once during the 80 minute hearing and never had to lie down.  Moreover, the Plaintiff told Dr. Brenner that sitting, not standing or lying down, helped his back pain.  Although the Plaintiff testified that he could stand for "[l]ess than 10 minutes at a time," he told Dr. Haque just over four months earlier that he could stand for 45 minutes.

Another contradiction cited by the ALJ was the Plaintiff's testimony that he could not turn his neck all the way to the right or left.  The ALJ observed that Plaintiff kept his neck turned approximately 80 degrees during his attorney's "entire examination without any visible signs of distress."  Additionally, Dr. Haque observed that Plaintiff could fully rotate his neck in both directions, notwithstanding similar complaints of limitation.  The Defendant asserts that, during the course of the Plaintiff's

20

medical treatments, his doctors only once noted range of motion limitations in the Plaintiff's neck, and repeatedly found no range of motion deficits.

The Defendant points to other alleged contradictions and exaggerations in the record.  Although the Plaintiff testified that he was discharged from the Army because he could not deploy with his unit due to physical problems, he told Dr. Quenzer that his legal problems prevented him from leaving the state and that he was discharged because of those legal problems.

Although he denied having numbness, tingling, dizziness or nausea on November 16, 2007, the Plaintiff complained on December 4, 2007, that those very symptoms were "long standing."

Additionally, on the same day in December 2007 that Plaintiff told his physical therapist that he "hardly ever gets headaches anymore," he told Dr. Shanks that he "continues to have headaches almost daily."  Three days later, he told the physical therapist that he got headaches once or twice a week.

The Defendant further notes that the record shows that Plaintiff

21

alternately claimed that he had no blurred vision, that his left eye (and not his right) was always blurry, and that his primary problem was blurriness in his right eye. A VA optometrist determined that Plaintiff's right eye had 20/20 vision, while his left eye was 20/40.

Although the Plaintiff testified that he had "severe nerve damage" in his back and that doctors told him he needed lumbar fusion surgery, the Plaintiff does not point to any evidence in the record which shows that a doctor made either diagnosis.

The Defendant next notes that Plaintiff testified in November 2008 that his pain flared up "quite, quite a bit," to the extent that it almost totally incapacitated him. He testified that this typically occurred at least one week out of the month. However, the Plaintiff also testified that his "bad days" occurred more than 20 days out of the month. A few months earlier, in June 2008, the Plaintiff told Dr. Haque that neither his back pain nor his neck pain had flared up or caused any periods of incapacitation in the past year.

The Plaintiff does not specifically address any of these contradictions

and exaggerations.  The Defendant alleges that Plaintiff at times cites medical evidence based entirely on his own reports of his condition.  Specifically, the Plaintiff notes that Dr. Brenner requested to "evaluate obstructional abnormality of brain which would be likely to cause recurrent severe headaches."  The Plaintiff neglects to mention that no abnormalities were discovered.

The Defendant points to other inconsistencies.  When Dr. Haque examined him, the Plaintiff did not report any headaches due to his neck and denied any "malaise, dizziness, visual disturbances, numbness, [or] weakness" due to his neck or his back.  The same day, the Plaintiff told Dr. Brenner that he had daily headaches that started in his neck and the back of his head, and that he experienced nausea and weakness.

The Plaintiff suggests that the ALJ did not properly evaluate every medical opinion and/or did not consider all of the relevant factors when evaluating the medical source opinion.  The Plaintiff also alleges that occasional symptom-free periods and the sporadic ability to work are not inconsistent with disability.

The Defendant notes that the applicable regulations and case law require that the ALJ "articulate specific reasons for discounting a claimant's testimony as being less than credible." <u>Schmidt v. Barnhart</u>, 395 F.3d 737, 746 (7th Cir. 2005). Thus, an ALJ may not simply ignore a claimant's testimony or base a negative credibility finding on a conflict between the objective medical evidence and his testimony. <u>See</u> <u>id.</u> at 746-47.

In this case, the ALJ cited the applicable regulations and Social Security rulings and discussed whether the Plaintiff's symptoms could be consistent with the objective medical evidence and other evidence. The ALJ provided several examples of why he found the Plaintiff to be less than credible. These examples include the Plaintiff's ability to perform a wide range of daily tasks, the ALJ's observations at the hearing, and the inconsistencies and/or exaggerations of the Plaintiff's symptoms. The Court finds that there was an adequate basis for the ALJ's credibility determination.

### C. Psychiatric evidence

The Plaintiff asserts that the ALJ discounted any psychiatric evidence

by declining to consider the Christian County Mental Health Records because the "records . . . seemed to indicate that it was filled out by a non-physician." In fact, the ALJ did consider evidence of mental disorders. He agreed with Dr. Quenzer that the Plaintiff's anxiety/adjustment disorder caused, at most, only mild limitations. Thus, the mental impairments were found to be not severe.

As for Melissa Brown's letter, the ALJ did not err in finding her opinion to be unpersuasive. The Plaintiff does not challenge the ALJ's finding that Brown was not an acceptable source. The opinions of acceptable medical sources contradict any suggestion of more than mild limitation as to any mental impairment. Accordingly, the ALJ's finding that any potential mental impairments were not severe is supported by the record.

Additionally, the ALJ relied on the vocational expert's testimony in determining that, even when accounting for mental impairments, the Plaintiff could still perform a significant number of jobs.

D. ALJ's finding regarding arachnoid cyst

25

The Plaintiff alleges that, after noting the growth in the Plaintiff's head "automatically results in a 60% rating regardless of any effect on functioning," the ALJ totally discounts the arachnoid cyst.  Moreover, the Plaintiff contends that the ALJ did not give proper consideration to his headaches and at times misinterpreted the medical records or notes.

The ALJ found no indication that the cyst itself caused limitations, observing that the VA's assignment of a 60% service-connected disability rating was assigned automatically for any benign brain growth.  The Defendant alleges that only one doctor, Dr. Brenner, specifically recommended evaluation of the Plaintiff's cyst for possible treatment or surgery.  The evaluation revealed no structural abnormalities in the brain. There were no recommendations for surgery or further treatment.  The ALJ found that no doctor ever concluded that the cyst caused limitations or required any treatment. Although the Plaintiff emphasizes that he was once told he might have to have "shunt surgery," the VA notes from July 2008 appear to indicate that the radiologist found no abnormalities.

To the extent that Plaintiff is arguing that the arachnoid cyst caused

"severe headaches" which the ALJ did not properly consider, the ALJ reasonably found the complaints about headaches to be often contradictory and therefore not credible.   Moreover, the Plaintiff testified that pain medication alleviated his pain within 45 minutes to an hour.  The Plaintiff does not cite any medical evidence in the record which indicates any work-related limitations resulting from either the cyst or his alleged headaches.  Accordingly, the ALJ's finding that the cyst or the Plaintiff's headaches did not cause any functional limitations is supported by substantial evidence.

E. Other ailments

The Plaintiff suggests that the ALJ did not properly evaluate every medical opinion received, in violation of the applicable regulations.  The Plaintiff states that he has "documented kyphosis, a positive EMG at multiple levels, and headaches."  He then alleges that the ALJ "fails to cite any physician opinion which supports his conclusion."

As the Defendant alleges, however, the Plaintiff offers only his subjective complaints, which include numerous inconsistencies and contradictions, to challenge the ALJ's findings.  The Plaintiff offers no

27

physician's opinions or other evidence in support of his assertions.

Although the Plaintiff suggests that the ALJ did not incorporate medical opinions related to his positive EMG findings and back problems into his residual functional capacity finding, the Plaintiff does not develop that argument.  However, the determination of a claimant's residual functional capacity is an issue reserved to the Commissioner.  See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).  In determining what a claimant can do despite his limitations, the Commissioner must consider all of the relevant evidence in the record.  See 20 C.F.R. §§ 404.1545(a), 416.945(a).

The ALJ noted that no physician ever offered an opinion of the Plaintiff's limitations due to his impairments.  As the Defendant states, the ALJ summarized the objective medical evidence that supported finding the Plaintiff's neck and back conditions were severe impairments.  Doctors found mild narrowing in the Plaintiff's lower lumbar spine with the lowest grade of spondylolysis.  The ALJ further stated that a cervical spine MRI also noted some minimal disc protrusion.  After considering the record, and "giving [the Plaintiff] every benefit of the doubt," the ALJ found that

Plaintiff could perform a limited range of sedentary work "due to [his] cervical spine disorder, lumbar spine disorder, and obesity."

The Court concludes that the ALJ's finding that Plaintiff's testimony was not entirely credible is supported by substantial evidence. Moreover, there was substantial evidence in the record which supported his finding that Plaintiff's allegations of severe limitations were not supported by the record. The ALJ credited the reliable objective medical findings of mild and low grade neck and back conditions. He found that these impairments along with obesity were severe and incorporated significant limitations into his finding as to residual functioning capacity.

Accordingly, the Court finds that the ALJ's reasoning with respect to his residual functional capacity finding is supported by the record.


## IV. CONCLUSION

Based on the foregoing, the Court concludes that the ALJ's factual findings are supported by substantial evidence and his decision denying disability insurance benefits and social security income under the Social

29

Security Act is free of legal error.

Ergo, the Plaintiff's motion for summary judgment [d/e 10] is DENIED.  The Defendant's motion for summary affirmance [d/e 14] is ALLOWED.

ENTER: June 1, 2010

FOR THE COURT:

s/Richard Mills
United States District Judge

30